CITY OF HUMBLE, et al., Appellants,

v.

METROPOLITAN TRANSIT AUTHORI-TY, et al., Appellees.

No. 13390.

Court of Appeals of Texas, Austin.

June 2, 1982.

Rehearing Denied July 28, 1982.

Robert L. Burns, Sears & Burns, Houston, for appellants.

Mark White, Atty. Gen., Jonathan Day, Asst. Atty. Gen., Austin, for appellees.

SHANNON, Justice.

Appellants, City of Humble, and others [1] filed suit in the district court of Travis County against the Metropolitan Transit Authority seeking a declaratory judgment pursuant to Tex.Rev.Civ.Stat.Ann. art. 2524–1 (1965). Metropolitan Transit Authority, sometimes referred to as "MTA" or "the authority," is a public body created pursuant to Tex.Rev.Civ.Stat.Ann. art. 1118x (Supp.1982) for the purpose of providing mass transit for the Houston metropolitan area. By their suit appellants sought a declaration that art. 1118x is void and unconstitutional; that the MTA is without legal existence; that the authority is without power to collect a sales and use tax or spend the proceeds from the tax; and that the Comptroller of Texas is not authorized to administer and collect the sales and use tax. After a bench trial, the district court rendered judgment that appellants take nothing. This Court will affirm that judgment.

Article 1118x was enacted in 1973 [2] to help the state's urban areas remedy their ever-expanding problems [3] such as traffic congestion and air pollution which resulted in part from the lack of mass transit systems in those areas. Section 3(e) of the Act provides that the governing body of the principal city in a metropolitan area may create a transit authority by ordinance after a public hearing. After the governing body of a principal city creates a transit authority and constitutes a transit authority board, an election may be called by that board to confirm the existence of the authority and to authorize levy of a tax to finance the authority. The election is held within an area known as the "initial territory" [4] of the authority, but the statute requires more than a simple majority of votes within the "initial territory" to confirm the authority and authorize the tax.

The statute divides the "initial territory" of the authority into three categories of voting units. These units are:

1. Other appellants are Wilson's Superette, Inc., a business within the City of Humble and Wilson Archer, Jerry Hamilton, and Ellis L. Herron, all voting residents of Humble.

2. Article 1118x has been amended in each subsequent session of the legislature. *See, e.g.,* 1975 Tex.Gen.Laws, ch. 712, at 2273; 1977 Tex. Gen.Laws, ch. 863, at 2168; 1979 Tex.Gen. Laws, ch. 629, at 1427; 1981 Tex.Gen.Laws, ch. 858, at 3261.

3. The legislature made certain findings included in the Act which state:

   (a) A dominant part of the state's population is located in its rapidly expanding metropolitan areas which generally cross the boundary lines of local jurisdictions and often extend into two or more counties;

   (b) The concentration of population in such areas is accompanied by a corresponding concentration of motor vehicles which are generally powered by internal combustion engines that emit pollutants into the air, which emissions result in increasing dangers to the public health and welfare, including damage to and deterioration of property as well as harm to persons, and hazards to air and ground transportation;

   (c) Such concentration of motor vehicles places an undue burden on existing streets, freeways and other traffic ways, resulting in serious vehicular traffic congestion that retards mobility of persons and property and

adversely affects the health and welfare of the citizens and the economic life of the areas;

   (d) The proliferation of the use of motor vehicles for passenger transportation in such areas is caused in substantial part by the absence or inefficiency and high cost of mass transit services available to the citizens of such areas, and it is in the public interest to encourage and provide for efficient and economical local mass rapid transit systems in such areas for the benefit and convenience of the people and for the purpose of improving the quality of the ambient air therein and reducing vehicular traffic congestion; and

   (e) The inalienable right of all natural persons to use the air for natural purposes does not vest in any persons the right to pollute the air by artificial means, but such artificial use is subject to regulation and control by the state.

Tex.Rev.Civ.Stat.Ann. art. 1118x, § 1 (Supp. 1982).

4. The Act states an "initial territory" of an authority "shall be all the territory included in the county in which the major portion of the principal city is situated, plus any additional territory that is in an adjacent county and is included in the [authorizing] ordinance or resolution." Tex.Rev.Civ.Stat.Ann. art. 1118x, § 3(b) (Supp.1982).

(1) the portion of the principal city inside the initial limits of the authority plus any incorporated cities or towns which are wholly located within that perimeter of the outer boundary of the principal city constitutes a unit of election;

(2) each designated election area created by a commissioners court constitutes a unit of election;

(3) every other incorporated city or town wholly located within the initial limits of the authority shall constitute a unit of election.

Tex.Rev.Civ.Stat.Ann. art. 1118x, § 5(f) (Supp.1982). The Act, then, provides for an indefinite number of voting units in addition to the single unit formed by the outer perimeter of the principal city. The number of voting units, in addition to the principal city unit, depends on the number of units created by the commissioners courts of the counties included within the "initial territory" and on the number of incorporated cities or towns outside the outer boundary of the principal city but within the "initial territory."

In this appeal, the statutory election scheme resulted in the creation of twenty-nine election units, each of which would be included in the MTA and be subject to the tax if a majority of voters within a given unit voted *for* confirmation. These units were:

(1) *one* election unit formed by the city of Houston and *all* cities wholly within the outer boundary of Houston: Bellaire, West University Place, Southside Place, Bunker Hill, Hedwig, Hilshire, Hunters Creek, Piney Point, Spring Valley, and *Humble*;

(2) *five* election units established by the commissioners court of Harris County encompassing all unincorporated territory within Harris County; and

(3) *twenty-three* election units comprised of all cities within the "initial territory" of the authority but partially or completely

outside the city limits of Houston: Baytown, Deer Park, El Lago, Friendswood, Galena Park, Jacinto City, Jersey Village, Katy, La Porte, Lomax, Missouri City, Morgan's Point, Nassau Bay, Pasadena, Pearland, Seabrook, Shoreacres, South Houston, Stafford, Taylor Lake Village, Tomball, Waller, and Webster.

A confirmation election pursuant to § 5 of art. 1118x was held on August 12, 1978. A majority of voters in the principal city voting unit of Houston and other enclave cities (including Humble) confirmed the MTA and the tax. Two of the five election units in unincorporated areas of Harris County approved the MTA and the tax, and a majority in seven of the twenty-three outlying incorporated cities elected for inclusion in the Authority.[5]

A majority of votes in the precincts of Humble were cast against the MTA. The vote in the Humble precincts, however, was pooled with the total vote in the principal city voting unit which overwhelmingly opted for MTA. Humble was therefore included in the MTA and subject to the sales and use tax.

In their first two points of error, appellants claim the statutory scheme of voting created in § 5(f) of art. 1118x violates the equal protection provision of the Fourteenth Amendment of the Constitution of the United States and art. I, § 3 of the Constitution of Texas. Specifically, appellants allege § 5(f) discriminates against qualified voters and residents of the cities located within the outer boundary of Houston, because those residents' votes are diluted when pooled with the large number of Houston votes, while the votes of residents of cities *outside* the Houston city limits are tabulated separately in each city.

In addition, appellants contend the statutory voting scheme denies residents of the "inner" cities equal protection because the scheme violates the constitutional principle

5. The seven cities voting *for* inclusion in the MTA were El Lago, Friendswood, Katy, Missouri City, Shoreacres, Taylor Lake Village, and Waller. Cities voting *against* MTA were Baytown, Deer Park, Galena Park, Jacinto City, Jersey Village, La Porte, Lomax, Morgan's Point, Nassau Bay, Pasadena, Pearland, Seabrook, South Houston, Stafford, Tomball, and Webster.

of "one person, one vote." This claim is based on the fact that the population of the twenty-nine voting units created for the MTA confirmation election varies widely.[6]

■■■ A statute is presumed constitutional. The Supreme Court of Texas, quoting *Middleton v. Texas Power & Light Co.*, 249 U.S. 152, 39 S.Ct. 227, 63 L.Ed. 527 (1919), has stated "[t]here is a strong presumption that a legislature understands and correctly appreciates the needs of its own people, that its laws are directed to problems made manifest by experience, and that its discriminations are based upon adequate grounds." *Texas National Guard Armory Board v. McCraw*, 132 Tex. 613, 126 S.W.2d 627, 634 (1939); *see also Town of Lockport v. Citizens for Community Action*, 430 U.S. 259, 272, 97 S.Ct. 1047, 1055, 51 L.Ed.2d 313 (1977). This Court is obliged, if possible, to construe a statute in a manner sustaining its constitutionality. *Key Western Life Insurance Co. v. State Board of Insurance*, 163 Tex. 11, 350 S.W.2d 839, 849 (1961). A statute does not violate the equal protection guarantee of the United States or Texas constitutions if there is a rational basis for the classifications in the statute. *Texas Women's University v. Chayklintaste*, 530 S.W.2d 927, 928 (Tex.1975). A rational basis for a statutory classification exists if any state of facts may be reasonably conceived to justify the scheme. *Carl v. South San Antonio Independent School District*, 561 S.W.2d 560, 563 (Tex.Civ.App.1978, writ ref'd n.r.e.) (quoting *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)).

Situations may be envisaged which justify the statutory voting scheme set forth in art. 1118x. Enclave cities incorporated within a larger principal city, such as Houston, have virtually identical interests with the larger city in the development of a mass transit system. Small incorporated cities

6. The population of the twenty-nine districts, based on the 1970 census and on 1978 estimates, is as follows:

| VOTING UNIT | 1970 | 1978 |
|---|---|---|
| HOUSTON (1) | 1.3 million (approx.) | 1.7 million (approx.) |
| COUNTY UNITS: (5) | | |
| #1 | 32,399 | 141,703 |
| #2 | 105,529 | 317,323 |
| #3 | 58,406 | 113,292 |
| #4 | 22,963 | 38,391 |
| #5 | 18,953 | 67,946 |
| SEPARATE INCORPORATED CITIES: (23) | | |
| BAYTOWN | 43,980 | 48,114 |
| DEER PARK | 12,773 | 21,214 |
| EL LAGO | 949 | 3,500 |
| FRIENDSWOOD | 7,433 | 8,850 |
| GALENA PARK | 10,479 | 9,329 |
| JACINTO CITY | 9,563 | 10,397 |
| JERSEY VILLAGE | 765 | 3,297 |
| KATY | 2,596 | 4,309 |
| LA PORTE | 7,149 | 8,899 |
| LOMAX | 893 | 2,964 |
| MISSOURI CITY | 4,136 | 13,520 |
| MORGANS POINT | 593 | 752 |
| NASSAU BAY | 2,240 | 4,510 |
| PASADENA | 89,277 | 105,209 |
| PEARLAND | 6,444 | 12,234 |
| SEABROOK | 3,811 | 5,760 |
| SHOREACRES | 1,872 | 1,662 |
| SOUTH HOUSTON | 11,527 | 12,996 |
| STAFFORD | 2,905 | 13,147 |
| TAYLOR LAKE VILLAGE | 1,798 | 1,819 |
| TOMBALL | 2,734 | 3,817 |
| WALLER | 1,123 | 1,365 |
| WEBSTER | 2,231 | 3,108 |

located wholly within the city limits of a principal city are often physically indistinguishable from the larger city, separated only by legal boundaries. The larger city and its "inner" cities are often interconnected by an extensive network of streets. Pedestrian and automobile traffic moves freely between these units, and the persons living in the various cities conduct commercial and social activities across city limit lines with little or no regard for a particular city's jurisdiction.

Permitting each inner city to vote for or against a transit system as an individual unit would most probably impair the success of a comprehensive rapid transit system. Transit system routes, at great expense, would have to be designed around non-participating inner cities. Furthermore, residents of non-participating enclave cities could readily use the system without bearing their proportionate share of the tax which supports the system.

█ For the purposes of developing a comprehensive urban mass transit system, our view is that the legislature acted rationally in authorizing creation of a principal city voting unit in which the votes of enclave city residents, whose interest in a rapid-transit system would be virtually identical to that of residents of the larger city, were tabulated with the votes of the principal city.[7]

Cities lying outside the principal city's limits also might have a similar interest in access to a mass-transit system. However, these localities are not situated within the inner city, and the substantial success of the mass-transit system would not be impaired if these cities elected not to participate. Because of their relative geographical distance from the principal city, residents of the outer cities which chose not to join the authority could not avail themselves of the

system's service as easily as residents of the inner city. While some residents might disagree with the results of the legislature's line-drawing in art. 1118x, those lines, in our view, were rationally drawn and do not violate equal protection.

Appellants allege a further violation of equal protection in that the MTA voting units created in compliance with art. 1118x violate the federal constitutional guarantee of "one person, one vote."[8] The "one person, one vote" doctrine requires that voting districts for the election of governmental representatives on the national, state, and local levels be substantially equal in population. See generally Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) (requiring population equality in U. S. Congressional districts); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (similar requirement for state legislative districts); Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968) (requirement applied to county commissioners court); Hadley v. Junior College District, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970) (requirement applied to districts for junior college trustees). The requirement applies only to election districts of officials to those national, state, and local units which exercise "general governmental powers." Avery v. Midland County, 390 U.S. at 485–6, 88 S.Ct. at 1120–21. The Supreme Court has refused to extend the "one person, one vote" requirement to governmental bodies created for more limited purposes. Salyer Land Co. v. Tulare Water District, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973) ("one person, one vote" not applicable to election of trustees for water storage district); Ball v. James, 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981) (requirement not appli-

---

7. See 1977 Tex.Gen.Laws, ch. 863, § 5(f)(1), at 2172.

8. Justice Douglas created the term in his majority opinion in Gray v. Sanders, 372 U.S. 368, 381, 83 S.Ct. 801, 809, 9 L.Ed.2d 821 (1963): "The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth,

and Nineteenth Amendments can mean only one thing—one person, one vote."

In his concurring opinion in the case, Justice Stewart commented, "Within a given constituency, there can be no room for but a single constitutional rule—one voter, one vote." Id. at 382, 83 S.Ct. at 809.

cable to election of directors for water storage and electrical power district affecting large percentage of Arizona citizens).

Furthermore, the present appeal may be distinguished from the traditional "one person, one vote" cases because the election districts in the present case were not created for election of governmental officials. The units created by art. 1118x are for a referendum-type election involving voting on a particular *issue*, rather than on a candidate seeking to represent a particular constituency. The applicability of the "one person, one vote" doctrine to these types of elections was discussed by the Supreme Court in *Town of Lockport v. Citizens for Community Action*, 430 U.S. 259, 97 S.Ct. 1047, 51 L.Ed.2d 313 (1977) in which the Court commented:

> The equal protection principles applicable in gauging the fairness of an election involving the choice of legislative representatives are of limited relevance, however, in analyzing the propriety of recognizing distinctive voter interests in a "single-shot" referendum. In a referendum, the expression of voter will is direct, and there is no need to assure that the voters' views will be adequately represented through their representatives in the legislature. The policy impact of a referendum is also different in kind from the impact of choosing representatives—instead of sending legislators off to the state capital to vote on a multitude of issues, the referendum puts one discrete issue to the voters. That issue is capable, at least, of being analyzed to determine whether its adoption or rejection will have a disproportionate impact to an identifiable group of voters.

*Id.* at 266, 97 S.Ct. at 1052. The precise question in *Lockport* was whether the state could require separate majorities of city and non-city voters, rather than a simple majority of all voters in a county, to approve a proposed county charter. The Court held such a voting scheme did not violate equal protection because the interests of city and non-city voters in approving a new county charter differed sufficiently to justify the separate majority approval requirement of the statute.

■ Under the rationale of *Lockport*, the voting scheme created in art. 1118x is constitutional. This scheme recognizes the distinctive interests of voters living in incorporated cities inside the principal city's outer limits (whose interests are substantially identical with residents of the principal city) and voters living in cities located outside the perimeter of the principal city. The voters of the "enclave" cities are not *denied* the right to vote in the transit authority referendum; their votes are sensibly counted as part of the principal city's votes because of these voters' identity of interest.

■ Basically, Humble complains of its inclusion in the principal city voting unit because of its relative distance from Houston compared to other "enclave" cities. While Humble may have characteristics similar to other outlying cities which voted separately on the MTA issue, Humble undisputably is encompassed by the outer boundary of Houston. Humble and its residents simply suffer the pinch of being included within a constitutionally permissible classification. Appellees refer to language from a Supreme Court case that is pertinent to this appeal:

> When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself, without regard to the necessity behind it, the line or point seems arbitrary. It might as well, or nearly as well, be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark.

*Louisville Gas Co. v. Coleman*, 277 U.S. 32, 41, 48 S.Ct. 423, 426, 72 L.Ed. 770 (1928)

(Holmes, J., dissenting) *quoted* in *Village of Belle Terre v. Boraas,* 416 U.S. 1, 8 n.5, 94 S.Ct. 1536, 1540 n.5, 39 L.Ed.2d 797 (1974). Although appellants may have preferred that the legislature draw the line more strictly to exclude Humble or more leniently to include other cities outside Houston's city limits, appellants' dissatisfaction is not grounds for invalidating the statute if the class which included Humble is constitutionally justifiable.

By point of error three, appellants argue art. 1118x violates the Fourteenth Amendment of the United States Constitution and art. I, § 3 of .the Texas Constitution because the statute requires the board of directors of a rapid-transit authority be appointed, rather than elected. The statute specifically provides that the mayor of the principal city, the commissioners court of the principal city's county, and the mayors of other incorporated cities besides the principal city within an authority each may appoint a specified number of directors. Art. 1118x, §§ 4(a), 6B.

The MTA is authorized to exercise powers necessary for the creation and maintenance of a mass transit system, including the right to levy and collect taxes, issue tax and revenue bonds, and promulgate penal regulations relating to the use of the transit system. Further the MTA is authorized to exercise the power of eminent domain. *See generally* art. 1118x, § 6. Appellants urge that the appointment of directors, rather than their election by the public, is constitutionally impermissible because of the range of powers the directors may exercise.

■ Initially, appellants are advancing an improper constitutional argument. The basis for an equal protection violation is that similarly situated individuals are treated differently by the government. See L. Tribe, *American Constitutional Law* § 16–1, at 993 (1978). While appellants may believe the appointment scheme violates some constitutional command, no cognizable equal protection violation exists under this aspect of art. 1118x because all citizens within the transit authority are treated equally, *i.e.,* no one has the right to elect a director. No impermissible statutory discrimination exists because *all* persons affected by the statute are deprived of the right appellants assert.

Regarding the substantive merits of appellants' claim, the Supreme Court has not recognized a constitutional requirement that public officials be elected rather than appointed. In *Sailors v. Board of Education,* 387 U.S. 105, 108, 87 S.Ct. 1549, 1552, 18 L.Ed.2d 650 (1967) the Court held the U. S. Constitution does not require the election of public officials who exercise "non-legislative" functions. The Court has yet to decide whether officials exercising "legislative" functions must be chosen by popular election.

■ In this regard, Prof. Tribe has stated:

In the area of voting, it is clear that government has wide discretion, at least at the state and local levels, to avoid granting public participation through the ·franchise—by employing appointed officials rather than elected ones, for example.... Thus, while the Supreme Court has never required a state to hold elections for any particular office, "once the franchise is granted to the electorate, lines may not be drawn that are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."

L. Tribe, *supra* § 16–10, at 1007. The legislature, in art. 1118x, permissibly refused to grant the franchise for the purposes of electing the MTA directors.

■ Appellants contend by points of error four and five that art. 1118x violates the state constitutional prohibition against local or special laws. Tex.Const. art. III, § 56. Specifically, appellants assert §§ 3(a) and (b) of art. 1118x creates a closed class of cities which may establish a rapid-transit authority under the Act.

Subsections (a) and (b) of § 3, as it existed in 1977, provided in relevant part:

(a) The governing body of a principal city in a metropolitan area may, on its own motion, shall, as provided in Subsection (b) of this section, and shall, upon

being presented with a petition so requesting signed by not less than 5,000 qualified voters residing within such metropolitan area, institute proceedings to create a rapid transit authority in the manner prescribed in this section.

(b) Such governing body shall by ordinance or resolution fix a time before December 1, 1977, and a place for holding a public hearing on the question of creating an authority. The governing body also shall by ordinance, or resolution, after receipt of a petition as provided in Subsection (a) of this section, and may, on its own motion fix a time and place for holding a public hearing on a proposal to create an authority.

1977 Tex.Gen.Laws, ch. 863, § 3, at 2169–70. Appellants argue the December 1, 1977 date in Subsection (b) precludes the governing body of a city from creating a transit authority if it did not hold a public hearing by that date. Appellants misapprehend the meaning of the statute.

This Court is charged to construe a statute so as to uphold its validity, if possible. While Subsections (a) and (b) may not be "models of draftsmanship," they do not, in our opinion, create a closed class. This Court reads the statute to mean that the governing body of a principal city *must* hold a hearing on the creation of a transit authority by December 1, 1977 if that principal city is located in a "metropolitan area"[9] existing *on the effective date of the Act.*

If the governing body of a principal city is situated in an area which qualifies as a "metropolitan area" *after* the effective date of the Act, that governing body *may* institute proceedings to create an authority on its own motion, and must institute those proceedings upon being presented with a proper petition.

9. The 1977 Act defined "metropolitan area" as:
any area within the State of Texas having a population density of not less than 250 persons per square mile and containing not less than 51 per cent of the incorporated territory comprising a city having a population of not less than 600,000 inhabitants according to the last preceding or any future federal census, and in

It is plain, we think, that any city in the future may create a transit authority if it is located in a "metropolitan area" qualifying as such under the statute. Although a "metropolitan area" as defined in the statute must include a city of not less than 600,000 inhabitants, the population requirement does not create a closed class. Any metropolitan area reaching that population figure in the future may qualify under the statute. While the 600,000 inhabitant population requirement does restrict the application of art. 1118x, the figure is a permissible standard for classification under the law. *See Robinson v. Hill*, 507 S.W.2d 521, 525–6 (Tex.1974). The legislature could rationally determine that the powers granted in art. 1118x were necessary to enable cities with populations of 600,000 or greater to address their transportation problems.

■ Appellants complain in point of error six that art. 1118x violates art. III, § 35 of the Texas Constitution. That section prohibits any bill introduced in the legislature from containing more than one subject and requires that subject to be expressed in the bill's title. Appellants claim the title of the 1977 act amending art. 1118x failed to disclose an amendment in the Act permitting transit authorities to levy a sales and use tax.

Article 1118x, as amended by the legislature in 1975, allowed the board of directors of a transit authority to collect revenue through any kind of tax other than an ad valorem or sales and use tax. 1975 Tex. Gen.Laws, ch. 712, § 11A, at 2282. The 1977 amendments to art. 1118x authorized transit authority boards to levy a sales and use tax subject to subsequent approval by voters residing in an authority. 1977 Tex. Gen.Laws, ch. 863, §§ 11A(a), 11B(a), at 2183. The title of the 1977 act stated the act related to "the creation, administration,

which there may be situated other incorporated cities, towns and villages and the suburban areas and environs thereof; provided, however, that bi-county metropolitan areas as subsequently defined herein, are not included or in any way affected by this Act.
1977 Tex.Gen.Laws, ch. 863, § 2(a), at 2169.

and powers of metropolitan rapid transit authorities; amending Sections 1 through 17A of, and adding Sections 6C and 11B to [the original act]." *Id.* at 2168. The question presented is whether the lack of an express reference to a sales and use tax in this title violates § 35 of art. III of the Texas Constitution.

Section 35 is accorded liberal construction when applied to the title of an act amending prior legislation. The Supreme Court, addressing this issue, has written:

> The purpose of a title is to give a general statement of, and call attention to, the subject matter of an act, so that the legislators may be apprised of the subject of the legislation. With amendatory bills, it is settled that reference to the act or section to be amended is adequate, as long as the subject matter of the amendment is germane or reasonably related to the content of the original act. [citation omitted].
>
> There is no constitutional requirement that the caption of an amendatory act set out exactly what changes were made in the amended act, [citation omitted], so long as the subject of the amendatory act is not "remote" from the subject of the original act, as in *Board of Water Engineers v. City of San Antonio*, 155 Tex. 111, 283 S.W.2d 722 (1955). "It would be burdensome if not intolerable to require that the title [or caption of an act] should be as full as the act itself. The word 'title' implies that no such requirement exists." [citation omitted]. It is not necessary that the caption of an amendatory bill apprise the reader of the precise effects of the body of the bill, so long as the general subject of the amending bill is disclosed.

*Smith v. Davis*, 426 S.W.2d 827, 833 (Tex. 1968).

The title of the 1977 amending act discloses it adds § 11B, which authorizes a sales and use tax, to the prior act. Since § 11A of the prior act was entitled "General Powers of Taxation," the amending act does refer to the section to be amended. The 1977 amendment, in permitting an authority to levy a sales and use tax, is "germane or reasonably related" to the original act which gave transit authorities power to tax, although the original taxing power was more restrictive in that the only tax which could be assessed at that time was a motor vehicles emissions tax. The expansion of an authority's taxing power in subsequent acts is directly related to the subject of the original act.

The 1977 amendment is not the "remote" type of amendment invalidated in *Board of Water Engineers v. City of San Antonio*, 155 Tex. 111, 283 S.W.2d 722, 727 (1955). In that case an amendment adding a provision to an existing statute was void because the amending act did not specify the section number to be added to the original act, and the additional section, a prohibition against removal of water from the Guadalupe and Comal River watersheds to points outside those watersheds, was not germane to the original act, which permitted the creation of water supply corporations. Section 11A of art. 1118x does not *assess* a sales and use tax on anyone, but instead provides an additional means by which transit authorities may raise revenue. Only a strained interpretation of art. 1118x would require a finding that legislative authorization of a sales and use tax is not germane or reasonably related to a broad statutory enactment prescribing the powers and duties of a mass-transit authority.

█ Appellants claim by point of error ten that the legislature's authorization of mass-transit authorities in art. 1118x is unconstitutional because the Constitution of Texas does not expressly grant power to the legislature to create these authorities. Appellants concede the state constitution is not a *grant* of power, but a limitation upon the power of the state to act. Therefore, absent an express or directly implied prohibition in that document, it follows the legislature is free to enact laws which it deems are in the best interest of the people of the State. *See Shepherd v. San Jacinto Junior College District*, 363 S.W.2d 742, 743 (Tex. 1963).

The Supreme Court has addressed an identical challenge to the legislature's authority to create an urban renewal agency.

Appellants challenge the authority of the Legislature to create a public body corporate and politic to be known as an Urban Renewal Agency. They argue that the Legislature may create only those bodies politic specifically set out in the Constitution or which are authorized to conserve natural resources under Section 59 of Article 16 of our Constitution. They cite no authority to support their views, and we have found none.

On the contrary, this Court upheld the delegation of authority to, and the actions of, the Housing Authority of Dallas in that slum-clearance-low-cost housing case. An analogous attack was made upon the National Guard Armory Board, a body politic and corporate, and upon the Texas Turnpike Authority. In both instances, the existence of the agencies and the delegation of authority to them was upheld.

*Davis v. City of Lubbock*, 160 Tex. 38, 326 S.W.2d 699, 710 (1959) (footnote references omitted).

 Appellants argue no Texas case has upheld creation of political subdivisions *with taxing power* which are not expressly authorized by the Constitution. This assertion ignores the holding of *Shepherd v. San Jacinto Junior College District, supra*, sustaining a junior college district's power, not specifically authorized by the Constitution, to levy an ad valorem tax on property owners within the district. Appellants acknowledge the disagreement between the majority and dissenting opinions in *Shepherd* focused on whether the junior college district could constitutionally assess an *ad valorem* property tax. See generally *Shepherd*, 363 S.W.2d at 760–81. Assessment of an ad valorem tax by a transit authority is specifically prohibited in § 11A(a) of art. 1118x. Although a transit authority created under art. 1118x has broad taxing power, this attribute of the statute does not remove it from the rule of the numerous cases in which the Supreme Court has sustained legislative creation of political subdivisions or agencies not specifically authorized by the Constitution. Appellants' point of error is overruled.

Appellants' other points of error have been considered and are overruled.

The judgment is affirmed.