Honorable Hugh Parmer Chairman Committee on Inter-governmental Relations Texas State Senate P. O. Box 12068 Austin, Texas 78711
Re: Whether certain improvements may constitute `regional economic development facilities' within the meaning of article 1118x, V.T.C.S. (RQ-1296)
Dear Senator Parmer:
You have asked whether
 drainage projects, street and other infrastructural improvements, and library facilities can be considered `regional economic development facilities' as defined in section (6C)(e), article 1118x, V.T.C.S., as added by House Bill No. 2008, 70th Legislative Session.
Article 1118x, V.T.C.S., is a very lengthy, very detailed statute originally enacted in 1973 to help the state's urban areas remedy problems such as traffic congestion and air pollution which resulted in part from a lack of mass transit systems in those areas. City of Humble v. Metropolitan Transit Authority,636 S.W.2d 484 (Tex.App.-Austin 1982, writ ref'd n.r.e.), appeal dismissed sub nom., Archer v. Metropolitan Transit Authority,464 U.S. 802 (1983). Generally, it authorizes metropolitan areas, upon a vote of the electorate, to establish rapid transit authorities to be structured and operated in accordance with the act. Section 6C(e) was added to the statute by Acts 1987, 70th Leg., ch. 804, at 2796,[1] which also amended other sections of the act to complement the section 6C(e) provisions.
Section 6C deals with acquisition of station or terminal complexes by an authority. Subsection (a) thereof declares such acquisitions to be `public and governmental functions, exercised for a public purpose, and matters of public necessity for public use and public benefit.' Subsection (b) gives an authority power to acquire lands and interest in lands `adjacent or accessible to stations and other mass transit facilities, developed or to be developed by the authority' and to lease or transfer them to others subject to certain restrictions. Subsection (c) provides that any such acquisitions must be part of, or contained within, a complex needed for successful operation of the system and designated as such by an approved `comprehensive transit plan.' Subsection (d) states that a station or terminal complex `shall include adequate provisions for the transfer of passengers,' and `may include provisions for commercial, residential, recreational, institutional, and industrial facilities, except that no land or interest in land that is more than 1,500 feet in distance from the center point of the complex or that has not been included in a master plan of development adopted by the board may be acquired for the facilities.' V.T.C.S. art. 1118x, § 6C(d). (Emphasis added.)
In addition, subsection (e) of section 6C, the focus of your question, authorizes, in a station or terminal complex `of an authority created before January 1, 1980, in which the principal city had a population of less than 1,200,000' according to the most recent census, the inclusion of `regional economic development facilities' if approved by both the board of the authority and the governing body of the principal city. `Regional economic development facilities' are defined by the subsection as
 facilities which will lead to the creation of new jobs, maintain existing jobs or generally improve the conditions under which a local economy may prosper, and which include, but are not limited to, facilities used primarily for conventions, entertainment, special events, professional and amateur sports, or other lawful purposes.[2]
The remainder of subsection (e) deals with the power of the authority to institute a tax to pay for such facilities, the mechanics of doing so, and the limitations upon the use of the funds so raised, and with the type of agreements the authority might make to implement the realization of `regional economic development facilities.'
Although the power to include regional economic development facilities within a station or terminal complex is bestowed upon the authority by a separate subsection of section 6C, such facilities are only authorized if located `within' such a station or complex. Consequently, drainage projects, street and other infrastructural improvements, or library facilities located outside the permitted expanse of the station or terminal complex, could not be considered `regional economic development facilities' within the meaning of the statute, whether or not they would `lead to the creation of new jobs, maintain existing jobs or generally improve the conditions under which a local economy may prosper.'
Inasmuch as subsection (d) limits the expanse of such a station or terminal complex acquired for commercial, residential, recreational, institutional or industrial facilities to not more than 500 yards from the center point of the complex, the opportunity for drainage projects, street and other infrastructural improvements, or library facilities to qualify as regional economic development facilities is accordingly limited, but we cannot say that as a matter of law they could not be considered as such if they were located within the complex. Each situation will depend on its own particular facts. The criteria are that regional economic development facilities:
(1) must be located at a station or terminal complex;
 (2) must be aimed at providing jobs or improving economic conditions generally;
(3) must be dedicated to lawful purposes; and
(4) must meet statutory requirements for funding and approval.
 SUMMARY
To qualify as `regional economic development facilities' pursuant to section 6C(e) of article 1118x, V.T.C.S., such facilities must be located at a station or terminal complex, must be aimed at providing jobs or improving economic conditions generally, must be dedicated to lawful purposes, and must meet statutory requirements for funding and approval. Whether a particular facility qualifies will depend upon the facts peculiar to it.
Very truly yours,
 Jim Mattox Attorney General of Texas
 Mary Keller First Assistant Attorney General
 Lous McCreary Executive Assistant Attorney General
 Judge Zollie Steakly Special Assistant Attorney General
 Rick Gilpin Chairman Opinion Committee
 Prepared by Bruce Youngblood Assistant Attorney General
[1] The legislation has an interesting history. The content of House Bill No. 2008 originated under the style of Senate Bill No. 1536, introduced in the Senate on May 18, 1987, by Senator Tejeda. The bill was referred to the Senate Committee on Intergovernmental Relations, where it was taken up in public hearing on May 19. At that public hearing, Senator Tejeda explained that Senate Bill No. 1536 was to serve as a legislative vehicle in case some agreement could be worked out between San Antonio's transit authority (`VIA'), the San Antonio City Council, and the Bexar County delegation to the legislature. The bill would allow a 5-year, one-half-cent raise in the sales tax in San Antonio, subject to voter approval. The proceeds of that tax — some $150 million — would be dedicated to economic development projects undertaken in conjunction with mass transit facilities. Hearings on Senate Bill No. 1536 before the Senate Committee on Intergovernmental Relations, 70th Legislature (May 19, 1987).
The committee approved Senate Bill No. 1536 by a vote of 6-0, and the bill was passed unamended by the full Senate on May 22. The bill was then sent to the House of Representatives, where it was referred to the Committee on Urban Affairs. The House Committee on Urban Affairs considered Senate Bill No. 1536 in a formal meeting on May 27, 1987. There is no record of the discussion that took place at that meeting, but the members present did approve several important changes to the bill. See Bill Analysis, Tex. S.B. 1536, 70th Leg. (1987). The committee approved its substitute for Senate Bill No. 1536 by a vote of 12-0, and reported it back to the full house.
By this time, however, the regular session was drawing to a close, and there was a growing concern within the Bexar County delegation that Senate Bill No. 1536 was moving too slowly to ever reach the Governor's desk. A simple solution was found in House Bill No. 2008, which was then sitting in the Senate. House Bill No. 2008 was originally intended to create an economic development finance agency in Corpus Christi. It passed the House on May 6, but had become stalled in the Senate — reportedly due to the ill health of Senator Truan. On June 1, on motion of Senator Armbrister, the Senate suspended the rules and took up House Bill No. 2008. Senator Tejeda immediately offered an amendment to strike all below the enacting clause and substitute therefor the language of Senate Bill No. 1536, as amended by the House. The amendment was approved by a viva voce vote, and after one further amendment, the bill was passed by a vote of 31-0. See Senate Journal of Texas, 70th Leg., Reg. Sess., 2643-48 (1987). The bill was sent to the House of Representatives that same day. The House refused to concur with the Senate amendment, but a conference committee resolved the disagreement, and both houses managed to approve the conference report before the close of the legislative day.
[2] See Tex. Const. art. III, § 52-a added November 3, 1987. Because your question involves only matters of statutory construction, we do not consider constitutional provisions affecting the legislation.