[Civ. No. 48220. Second Dist., Div. Four. Oct. 7, 1977.]

BLANCHE HAWN et al., Plaintiffs and Appellants, v.
COUNTY OF VENTURA et al., Defendants and Respondents;
K. D. JOHNSON et al., Interveners and Respondents.

**COUNSEL**

Edward L. Lascher and Gideon Kanner for Plaintiffs and Appellants.

Dorothy L. Schechter, County Counsel, and R. Thomas Harris, Assistant County Counsel, for Defendants and Respondents.

Siple & Orrock and Randolph E. Siple for Interveners and Respondents.

**OPINION**

**JEFFERSON (Bernard), J.**—Plaintiffs City of Camarillo, a municipal corporation, and Camarillo residents Hawn, Scott and Lund, sought a writ of mandate as well as injunctive and declaratory relief to enforce Ventura County Airport Initiative Ordinance No. 1 (sometimes referred

to as Proposition A). Named as defendants were the County of Ventura, the Ventura County Board of Supervisors (Jones, Jewett, Grandsen, Flynn and Bennett), and certain Ventura County officials, Hamm, Lish and Volk. Shortly before trial, the trial court granted certain Ventura County residents the right to intervene in the suit; trial by the court proceeded pursuant to stipulated facts.

Findings of fact and conclusions of law were signed and filed by the trial court, awarding judgment to the defendants. The ordinance, which sought to place restrictions on the location of new airports in Ventura County, was declared unconstitutional. Plaintiffs have appealed from the judgment.[1]

I

*Background Discussion*

This is the second time that the dispute between certain residents of the City of Camarillo and Ventura County officials concerning county operation of the Oxnard Air Force Base as a county airport has been before this court.

For a number of years, Ventura County officials have desired to acquire the air force base from the federal government and to operate it; much of the base is located within the City of Camarillo, and some interested local citizens have sought to prevent such use. In 1971, proponents of an initiative designed to prohibit county operation of the airport attempted to place the initiative on the countywide ballot by filing a petition with the Ventura County Clerk. Acting upon advice from the county counsel that the proposed measure was invalid, the clerk refused to follow the procedure for examination of signatures, as set forth in Election Code section 3707, prior to placing the measure on the ballot. The proponents were successful in obtaining a writ of mandate directing the county clerk to proceed as required by law; the issuance of the writ, which was appealed, was affirmed by this court in *Gayle* v. *Hamm* (1972) 25 Cal.App.3d 250 [101 Cal.Rptr. 628]. It was there held that initiative petitions, emanating as they do from the People, may not be disposed of in this way, despite doubts as to their ultimate validity. It was pointed out that "the reserved initiative power in the electorate (Cal.

---

[1]By stipulation of the parties, plaintiff City of Camarillo abandoned its appeal and a judgment was entered ordering that the appeal be dismissed as to the City of Camarillo.

Const., art. IV, §§ 1 and 25) [is] an instance of 'fundamental democracy' as opposed to 'representative government' . . . ." (*Gayle, supra,* 25 Cal.App.3d 250, 257.)

Proponents of the County Airport Initiative Ordinance No. 1 then presented it to the voters at the November 4, 1974, election, and it was passed by a majority. In pertinent part, it reads as follows: "SECTION 1. [¶] (a). VOTERS SHALL HAVE THE RIGHT TO APPROVE AIRPORTS LOCATED WITHIN CITY LIMITS. Prior to the establishing, owning, operating, leasing or maintaining of any airport by the County of Ventura located in whole or in part within any incorporated city in the County of Ventura, approval by the majority of voters voting at any election on such issue of any such city shall first be obtained. [¶] (b) EFFECT ON EXISTING AIRPORTS. This Section shall not prohibit the County of Ventura from maintaining and operating any airport which was regularly and actively being operated by any governmental entity or agency as an airport on a day to day basis with flight operations as of December 1, 1972; provided, however, such excepted airport shall not have any runways added, nor shall any of the runways of such excepted airport be extended, widened, lengthened, strengthened nor capped unless the question of such addition, extension, widening, lengthening, strengthening or capping of such runway or runways has been submitted to the voters of the city in which such airport is located and a majority of those voting on such question have voted in favor thereof. Maintenance and repair of existing runways that would not expand the then existing levels of service provided by said runways may be performed without such a vote. [¶] SECTION 2. ZONING RESTRICTIONS AROUND AIRPORTS NOT LOCATED IN CITIES. Except as may be permitted pursuant to the provisions of Section 1 of this ordinance, the County of Ventura shall not establish, own, lease, operate nor maintain any airport located in unincorporated territory, if any portion of any runway of such airport is within one and one-half (1½) miles of any property limited by the applicable zoning ordinance for such property to residential uses."

Also included in the ordinance is a definition of what constitutes an airport within the meaning of the ordinance's provisions, delineation of the agencies and entities affected, and a severability clause seeking to retain the viability of the balance of the ordinance should certain portions thereof be determined to be invalid or unconstitutional.

Despite its passage, Ventura County officials proceeded with their plan to activate Oxnard Air Force Base as a county airport. When it appeared

that negotiations between Ventura County and the federal government were approaching fruition, plaintiffs, on July 28, 1975, filed the present petition for mandate to prevent the airport operation. As we have indicated, plaintiffs were unsuccessful in obtaining relief in the trial court.

## II

### *The Findings of Fact*

We summarize the pertinent findings of fact. The Oxnard Air Force Base has been in existence since the 1930's as a training facility for the federal armed services. In 1945, after World War II, it was deactivated and turned over to Ventura County and operated as an airport. In 1950, the United States Air Force again took possession of the premises, pursuant to the National Emergency Act and as a result of the Korean War. The base was then used for military purposes until December 31, 1969, at which time it was declared surplus United States property. Since that time, Ventura County has evidenced an interest in acquisition.

On May 15, 1973, Ventura County applied to the United States General Services Administration, in an effort to secure the air base. There have been subsequent revisions of the application and, at the time this matter was before the trial court, the application was still pending. In the application, Ventura County sought fee simple title to a major portion of the base facility of 652 acres, including a runway of 11,000 feet in length and 26 buildings containing 330,000 square feet of space.

The application contemplated "general aviation" operations at the base, defined as "all non-air carrier operations." However, assuming favorable resolution of environmental impact considerations, the airport would also eventually provide commercial aircraft facilities. Other portions of the base would be leased by the county to various supportive enterprises. No consideration was to be paid by the county for this acquisition. During the pendency of the application, Ventura County and the federal government entered into a lease agreement to facilitate Ventura County's temporary operation of the airport; the lease became effective August 28, 1975, and is to continue until disposition of the leased premises is made by the General Services Administration or five years have elapsed, whichever occurs first.

A substantial majority of the airport acreage lies within the incorporated limits of the City of Camarillo. However, there are portions of the airport located in unincorporated territory, within one and one-half miles of residentially zoned property. Thus, if the ordinance is valid, the establishment of the base as a county airport would be prohibited unless and until a majority of voters in Camarillo approved it (Section 1); and those portions of the base lying in unincorporated territory could not be used as airport facilities unless and until appropriate rezoning was undertaken (Section 2). However, under the ordinance, the voters in the unincorporated areas of Ventura County are not given an opportunity, as city voters are, to approve or reject the location of an airport on unincorporated land.

The findings also tell us that, in addition to the Oxnard Air Force Base proposed airport, there are three other airports within the County of Ventura. Santa Paula and Santa Susana Airports are small, private airports. The third—Ventura County-Oxnard Airport—is widely used, offering service to many small private aircraft and, also, offering a limited amount of scheduled commuter passenger service to Los Angeles and Santa Barbara. Cargo and freight facilities at all existing airports are very limited, and, according to the findings, there have been studies showing that there is a substantial and increasing need for commercial short-haul passenger service—a service which is not presently being met. The existing aircraft facilities, it is estimated, will be filled to capacity in five years; long-range forecasting is that in excess of 1,000 aircraft will be needed within ten years, while present capacity is less than 800 aircraft. There is reference in the findings to an erstwhile plan of the Ventura County Board of Supervisors to locate a new airport at Tierra Rejada, in the eastern end of the county, but the passage of the airport initiative and other problems intervened.

The trial court found that, other than the Oxnard Air Force Base, there are no airport development programs in existence to meet the existing and future demands for airport service in Ventura County; that the Ventura County-Oxnard site cannot be expanded, due to proximity to residential areas and high costs. Thus, it was determined that the Oxnard Air Force Base represents the "only present, feasible alternative" to meet airport requirements in the County of Ventura. "Reasons include the low development costs, its location near the geographical center of the County, easy freeway access, good weather, and a relatively low environmental impact level. In addition, the large amount of

leasable facilities . . . provide a unique opportunity, through the revenue thereby generated, to establish a self-paying aviation facility, without imposing additional taxpayer burdens." The findings of fact further stated that a new airport would be too expensive, costing between $10 million and $40 million, which Ventura County could not afford to pay. Airport site selection, it was stated, would be very difficult in terms of public access, weather and air space requirements, if the airport ordinance controlled.

## III

### *The Conclusions of Law*

The trial court concluded that the airport ordinance was unconstitutional, in that it violated the equal protection clause of the Fourteenth Amendment to the United States Constitution, as well as article I, section 7 and article IV, section 16, of the California Constitution. The ordinance was considered a violation of equal protection because, "in an election to pass on a proposed county airport action, all county residents, except those residing in the city where the airport is proposed to be located, are denied the right to vote. There is no compelling or rational basis to support the voting classification established by Proposition A."

The ordinance was also determined to be invalid because, by passage of the State Aeronautics Act (Pub. Util. Code, § 21001 et seq.) and other legislation, the state Legislature has preempted and occupied the field with respect to the location and establishment of county airports, properly delegating that power to county boards of supervisors, including the Ventura County Board of Supervisors, who act as "state agents" in selecting airport sites within a county. Thus, it was held that state preemption precluded the use of the initiative process to attempt control of the location of local airports.

There were still other conclusions of law: the initiative was deemed defective because the ordinance would divest the Ventura County Board of Supervisors of the power to enact future legislation concerning airport location, delegating that power unlawfully to city voters in Ventura County; the initiative ordinance also constituted an unlawful interference with the exercise of an important governmental function, i.e., the supervision of county airports.

On this appeal we note that plaintiffs do not attack the sufficiency of the evidence to support the findings. However, we view certain of the findings of fact as not too significant to the issues presented, in light of the noncontroversial fact that more airports are needed to provide service to the presumably increasing population of Ventura County. We have not been informed by either side of any significant population trends, buttressed by tangible evidence, which might affect the result here. Thus, we do not know how many voters there are in the unincorporated areas of Ventura County around Camarillo, or, for that matter, how many city voters reside in the path of aircraft takeoffs and landings at the Oxnard Air Force Base. In a sense, therefore, we decide this matter somewhat in a factual vacuum, because all parties have accepted the premise that the issues are matters of law alone.

We observe at the outset that the confrontation here is a classic one—one requiring the expenditure of an increasing amount of time in judicial review. The confrontation occurs between what has become the traditional argument in favor of "progress" and growth, and the emerging concept of finiteness, that we must protect the environmental values still existing in our local communities. (See *Construction Ind. Ass'n, Sonoma Co.* v. *City of Petaluma* (9th Cir. 1975) 522 F.2d 897, as an example of the recognition of the right of local communities to prevent uncontrolled growth which would impair local environmental values.) While the trial court's findings, favoring as they do the prevailing defendants, tell us that Ventura County is in need of more airports, they do not include recognition of a reality of which we may take judicial notice: that residents who live in the immediate vicinity of a busy airport must suffer the parade of undesirable elements involved around airports—congestion and dirt, certainly, but most important of all, noise—noise which interferes with the ability of the unfortunate nearby resident to carry on, without annoyance and frustration, the most routine aspects of life. The damage to these citizens, considered after the fact, has long been recognized as actionable in courts of law. (*United States* v. *Causby* (1946) 328 U.S. 256 [90 L.Ed. 1206, 66 S.Ct. 1062]; *Griggs* v. *Allegheny County* (1962) 369 U.S. 84 [7 L.Ed.2d 585, 82 S.Ct. 531]; *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920 [101 Cal.Rptr. 568, 496 P.2d 480]; *Aaron* v. *City of Los Angeles* (1974) 40 Cal.App.3d 471 [115 Cal.Rptr. 162].)

Efforts by embattled citizens to deal with the airport problem at its source have to date proved less than successful. (*Loma Portal Civic Club*

v. *American Airlines, Inc.* (1964) 61 Cal.2d 582 [39 Cal.Rptr. 708, 394 P.2d 548].) The record before us details the efforts made by certain Camarillo residents to attack the primary decision of airport site location in the face of the determination of local government officials to proceed, regardless of the majority vote against their actions which was recorded in the 1974 election.

## IV

### *Equal Protection of the Laws*

Plaintiffs contend that the trial court's decision—declaring the ordinance in question a violation of the equal-protection-of-the-laws provisions of the federal and state Constitutions—is erroneous. ■ We conclude, however, that Ventura County Airport Initiative Ordinance No. 1 contains a voting scheme which violates the equal protection clause of both the federal and state Constitutions in that it approves an invidious discrimination against noncity voters in Ventura County.

The concept of equal protection of the laws "has been judicially defined to mean that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes *in like circumstances* . . . ." (*Gray* v. *Whitmore* (1971) 17 Cal.App.3d 1, 21 [94 Cal.Rptr. 904].) (Italics added.) In the case at bench, we have an ordinance which confers upon voters within city limits the opportunity to vote on a local environmental issue—the location of an airport—while denying that same right to persons living outside of cities although the same airport may constitute a similar invasion of the environment.[2] The distinctive line drawn is a city boundary, while the local problem stretches across such boundaries in the case at bench.

■ "[A] court must determine at the threshold of any 'equal protection' analysis the 'level of scrutiny' or 'standard of review' which is appropriate to the case at hand." (*Gould* v. *Grubb* (1975) 14 Cal.3d 661, 669 [122 Cal.Rptr. 377, 536 P.2d 1337].) With respect to the appropriate level of scrutiny, "the United States Supreme Court has employed a

---

[2]Plaintiffs complain that the record tells us little of the interveners in the trial court, pointing out that no evidence was offered in support of their complaint in intervention. But plaintiffs at trial admitted the key allegation of the complaint in intervention—that interveners were residents, registered voters and taxpayers residing outside of the city limits of the City of Camarillo in the immediate vicinity of the City of Camarillo and the Oxnard Air Force Base. Although interveners did not file a brief on appeal, they adopted by reference respondents' brief, pursuant to rule 14(a) of the California Rules of Court.

two-level test for measuring legislative classifications against the equal protection clause. 'In the area of economic regulation, the high court has exercised restraint, investing legislation with a presumption of constitutionality and requiring merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose. [Citations.] [¶] On the other hand, in cases involving "suspect classifications" or touching on "fundamental interests," [fns. omitted] the court has adopted an attitude of active and critical analysis, subjecting the classification to strict scrutiny. [Citations.] Under the strict standard applied in such cases, the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose.' [Citations.]" (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 597 [96 Cal.Rptr. 601, 487 P.2d 1241].) (Italics in original.)

In the instant case, plaintiffs contend that the initiative ordinance, legislation by the people, should be adjudged by the less stringent, "rational relationship" standard, and further assert that there is clearly a rational relationship between city voting and airport location, excluding noncity voters, because of the particular problem that density of population causes for city voters.

However, the strict standard of review has long been held to apply to voting legislation which excludes certain potential voters from participation. (*Kramer* v. *Union School District* (1969) 395 U.S. 621 [23 L.Ed.2d 583, 89 S.Ct. 1886]; *Cipriano* v. *City of Houma* (1969) 395 U.S. 701 [23 L.Ed.2d 647, 89 S.Ct. 1897]; *Curtis* v. *Board of Supervisors* (1972) 7 Cal.3d 942 [104 Cal.Rptr. 297, 501 P.2d 537].) There has been a subsequent refinement of this general principle as it applies to analysis of legislative voting classifications: an exclusion of voters invoking strict constitutional scrutiny has been held to mean an "identifiable class" of voters (*Weber* v. *City Council* (1973) 9 Cal.3d 950 [109 Cal.Rptr. 553, 513 P.2d 601]; *Gordon* v. *Lance* (1971) 403 U.S. 1 [29 L.Ed.2d 273, 91 S.Ct. 1889]) and, "[a]lthough not every classification created . . . is subject to strict scrutiny, the 'compelling interest' measure must be applied if a classification has a 'real and appreciable impact' upon the equality, fairness and integrity of the electoral process." (*Choudhry* v. *Free* (1976) 17 Cal.3d 660, 664 [131 Cal.Rptr. 654, 552 P.2d 438]; see *Bullock* v. *Carter* (1972) 405 U.S. 134, 144 [31 L.Ed.2d 92, 100, 92 S.Ct. 849].) For a legislative classification relating to the elective process to *avoid* the strict scrutiny test of equal protection, it must have "only minimal, if any,

effect on the fundamental right to vote." (*Gould, supra,* 14 Cal.3d 661, 670.)

■ Thus we conclude that "strict" judicial scrutiny of the airport ordinance is required by the decisional law. The ordinance excludes an "identifiable class" of voters, namely, *noncity* voters in Ventura County and, as such, has a direct impact on the electoral process.

The compelling interest expressed in the initiative ordinance is the protection of local environmental values. However, we regard the ordinance as more of an attempt to regulate airport site selection than to prohibit airports, although the veto power conferred by section 1 to city voters not only gives them the power to prohibit airports within their borders but the power to "dump" the problem upon the disenfranchised residents of unincorporated areas. ■ The distinction drawn, in our view, was *not necessary* to further the *compelling* interest of the state, as expressed by the voters. Hence, the ordinance must fail. Assuming that airports must be located somewhere, environmental concerns over their location cannot be protected by such invidious discrimination.

Some purely local issues such as changes in the form of a local government are to be distinguished in terms of voter classification and equal protection.[3] But as the United States Supreme Court pointed out in *Reynolds* v. *Sims* (1964) 377 U.S. 533, 563, 568 [12 L.Ed.2d 506, 528, 531, 84 S.Ct. 1362], in the context of legislative reapportionment, "[w]eighting the votes of citizens differently, by any method or means, *merely because of where they happen to reside,* hardly seems justifiable. . . . A citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm." (Italics added.)

In a final effort to save the airport ordinance from the abyss of unconstitutionality, plaintiffs rely upon the recent United States Supreme Court decision of *Lockport* v. *Citizens for Community Action* (1977) 430 U.S. 259 [51 L.Ed.2d 313, 97 S.Ct. 1047]. Plaintiffs contend that this decision, involving a voting scheme measured in terms of equal

---

[3]Thus, the California Supreme Court has upheld the use of the initiative to compel protective zoning (*San Diego Bldg. Contractors Assn.* v. *City Council* (1974) 13 Cal.3d 205 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973]; *Builders Assn. of Santa Clara-Santa Cruz Counties* v. *Superior Court* (1974) 13 Cal.3d 225 [118 Cal.Rptr. 158, 529 P.2d 582]) in the face of due process attack. (See also *East Lake* v. *Forest City Enterprises, Inc.* (1976) 426 U.S. 668 [49 L.Ed.2d 132, 96 S.Ct. 2358], involving a somewhat similar holding by the United States Supreme Court with respect to an Ohio municipal charter amendment.)

protection, is persuasive authority on the issue presented in the case at bench. But nothing in the case supports the contention made.

*Lockport* dealt with a New York statute which provided that a new county charter was permissible only if approved in a referendum election by *separate* majorities of the voters who live in the cities within the county, and of those who live outside the cities. It was recognized that such a provision could have the effect of nullifying a proposed new charter if the majority of noncity voters disapproved, even though a majority of all voters in a county—including city and noncity voters—approved of the new charter. *Lockport* held that this New York statute was immune from attack under the equal protection clause of the Fourteenth Amendment.

The attack on the New York statute was made on the ground that *all* voters in a New York county have identical interests in the adoption or rejection of a new charter, and that any distinction, therefore, between voters drawn on the basis of residence and working to the detriment of an identifiable class is an invidious discrimination. The *Lockport* court conceded that, if it were clear that *all* voters in a county had substantially identical interests in the adoption of a new county charter, regardless of where they resided in the county, the New York law would constitute a denial of equal protection of the laws. But the *Lockport* court held that such a premise was unacceptable—that the New York law rested on the state's identification of the distinctive interests of the residents of the cities and towns within a county rather than their interests as residents of the county as a homogeneous unit. *Lockport* concluded that the separate voter approval requirements between city voters and noncity voters of a county was based on a perception that the impact of a restructuring of local government may be felt quite differently by city units of a county and the noncity units of a county in terms of public services. Hence, the New York law was deemed valid in recognizing the realities of the substantially differing electoral interests.

It is readily apparent that the New York law involved in *Lockport* is quite different from the airport initiative ordinance before us. *Lockport* did not deal with a statute which excluded voters based on residence. On the contrary, the statute in *Lockport* gave equal recognition to the interests of the noncity voters in a new county charter as it did to the interests of the city voters. The rationale of *Lockport* lends support to the contention that the airport ordinance before us constitutes an invidious discrimination against noncity residents and voters of Ventura County,

since such voters are given no standing to object to the location of an airport in their community even though they may be affected just as adversely by an airport as the voters who reside within the cities of Ventura County.

Although the airport ordinance contains a severability clause seeking to retain the viability of the balance of the ordinance should certain portions thereof be determined to be invalid or unconstitutional, we hold that section 2 of the ordinance cannot be sustained by itself. Section 2 makes reference to section 1 as being an exception to section 2. Section 2, therefore, is so intertwined with section 1 that if section 1 falls, section 2 must also fall. But, in addition, the provisions of section 2, which preclude the County of Ventura from establishing, maintaining or operating an airport located in *unincorporated* territory if any portion of any runway is within one and one-half miles of residential property, discriminates invidiously against residents of incorporated cities in favor of residents of unincorporated territory. Under section 2, the county is not precluded from locating an airport in an incorporated city with runways within one and one-half miles of residential property. No rational justification is shown for giving residential area residents of unincorporated territory protection not afforded to residential area residents of incorporated cities.

Since the initiative voting scheme of the airport ordinance renders it constitutionally defective as to both sections 1 and 2 as a violation of equal protection of the laws, we affirm the judgment of the trial court. Therefore, we find it unnecessary to consider other issues pertaining to the validity of the ordinance—determined by the trial court and raised by the parties.

The judgment is affirmed.

Kingsley, Acting P. J., and Dunn, J., concurred.

A petition for a rehearing was denied October 27, 1977, and the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied December 15, 1977.