TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

_____

|  |  |  |
|---|---|---|
| OPINION | : | No. 86-205 |
| of | : | JULY 8, 1986 |
| JOHN K. VAN DE KAMP<br>Attorney General | : | |
| RONALD M. WEISKOPF<br>Deputy Attorney General | : | |

_____

THE HONORABLE DENNIS A. BARLOW, COUNTY COUNSEL, COUNTY OF YUBA, has requested an opinion on the following questions:

1.     Does state law (Gov. Code, § 66780.5) require the approval of the City of Wheatland to amend the Yuba-Sutter Bi-County Solid Waste Management Plan?

2.     Does the Joint Powers Agreement entered into between Sutter County, Yuba County, Marysville, Live Oak, Yuba City and Wheatland to administer the Yuba-Sutter Bi-County Solid Waste Management Plan require the concurrence of the City of Wheatland to amend it?

3.     In the event that such approval is needed for either reason, is the requirement constitutional?

1

86-205

CONCLUSIONS

1.     State law does require the approval of the City of Wheatland to amend the Yuba-Sutter Bi-County Solid Waste Management Plan.

2.     The Joint Powers Agreement entered into between Sutter County, Yuba County, Marysville, Live Oak, Yuba City and Wheatland does require the approval of the City of Wheatland to amend the Yuba-Sutter Bi-County Solid Waste Management Plan.

3.     Said requirement is not unconstitutional.

ANALYSIS

Under the Nejedly-Z'berg-Dills Solid Waste Management and Resource Recovery Act of 1972 (Stats. 1972, ch. 342, p. 642, § 1; Gov. Code, tit. 7.3, chs. 1 & 2, §§ 66700-66794.5), the state's counties were required, in cooperation with affected local jurisdictions, to prepare "a comprehensive, coordinated solid waste management plan... for all waste disposal within the county and all waste originating therein ... to be disposed of outside of the county." (§ 66780.1.)[1] Said plans were to comply with the state solid waste plan management policy adopted by the State Solid Waste Management Board (§ 66780.7; cf. §§ 66711, 66722, 66770 and 66771) and with the hazardous waste standards set by the State Department of Health Services (§ 66780.7; cf. § 66713; Health & Saf.Code, § 25150), and they were to be submitted to those state agencies for review and approval (§ 66780.7). Said plans were also to be consistent with any applicable county or city general plan. (§ 66780.2; cf. § 66780, subd. (b); *Christward Ministry* v. *Superior Court* (1986) 180 Cal.App.3d 99, 111.) Thereafter no sites for solid waste disposal could be established or operated in a county except in conformity with its approved solid waste management plan. (§ 66784.) Amendments to plans could be effected, as would be necessary to establish an otherwise nonconforming site (§ 66784), when approved by a "majority of the cities within the county which contain a majority of the population of the [county's] incorporated area ..." (§ 66780.5, subd. (c)).

In 1973 the cities of Marysville and Yuba City, and Sutter and Yuba counties determined that an areawide approach to solid waste management would be preferable to the two individual counties planning separate systems: the two counties had similar economic, social and physical conditions, shared a high degree of interdependence, and had some common regulatory agencies (e.g., the Sutter-Yuba Health Department). In addition, the majority of wastes generated in Sutter County was

---

[1] Unidentified section references are to the Government Code.

disposed of in Yuba County. (Citizen's/Technical Committee, *Bi-County Solid Waste Plan and Program*, Final Draft (June 1976) at p. 1.)  Those four jurisdictions were joined by the cities of Wheatland and Live Oak in requesting technical assistance from the Sacramento Regional Area Planning Commission to draft a plan with a two-county approach. (*Ibid.*)[2]  A comprehensive bi-county plan, drafted with the participation of the affected jurisdictions as well as the state Solid Waste Management Board (*id.* at pp. 2-4), recommended inter alia that a centralized Joint Powers Agency be created to assume the responsibilities vested in the local jurisdictions and have administrative control over the entire two-county area solid waste system.  (*Id.* at p. 174.)  Pursuant thereto, a Joint Powers Agreement was entered into under the Joint Exercise of Powers Act (Gov. Code, tit. 1, div. 5, ch. 5, § 6500 et seq.) between the six affected jurisdictions -- to wit, the counties of Yuba and Sutter, and their incorporated areas, the cities of Wheatland, Marysville, Yuba City and Live Oak.  The Agreement created and established a Bi-County Solid Waste Authority to administer the Bi-County Solid Waste Plan "and any additional recommendations which may be amended to the original plan after unanimous adoption by the member jurisdictions."  (*Agreement*, § 9; cf. 2.)  The Authority is governed by a six-member board consisting of one supervisor appointed by each of the two member counties' Board of Supervisors and one councilperson appointed by each of the four member cities' City Council. (*Id.*, 2.)  A quorum of four representatives from the member jurisdictions is necessary "for the purpose of voting on any matter" (5) and "four affirmative votes are required for adoption or passage of any measure."  (*Id.*, 6).  We understand the bi-county Authority is the only one of its kind in the state.

The State Reclamation Board has required construction of a new sanitary landfill in the Yuba-Sutter area to replace an existing site in the City of Marysville. The Bi-County Authority authorized a site selection survey to examine alternative sites and it eventually chose a site on Ostrom Road in Yuba County five miles from the City of Wheatland. The existing Plan must be amended to accommodate the site. It has been approved by five of the six member jurisdictions which comprise the Authority, but the City of Wheatland has rejected the proposal. We are asked whether Wheatland's concurrence is necessary to amend the existing Plan to establish the site under state law (§ 66780.5, subd. (c)) or under the parties' Joint Powers Agreement and, if so, whether such requirement is constitutional.  We conclude that the City of Wheatland's

---

[2] A county could -- "with the agreement of a majority of the cities within the county [containing] a majority of the population of [its] incorporated area ...transfer the responsibility for the preparation of [its] solid waste management plan to the regional planning agency for the region recognized by the Council on Intergovernmental Relations." (Former § 66780 [Stats. 1972, ch. 342, *supra*, renumbered § 66780.1 and amended by Stats. 1982, ch. 1468, § 2; Stats. 1982, §§ 1488, 2.5; see also § 66717(4).)

3

concurrence is necessary under both state law and the Joint Powers Agreement establishing the bi-county Authority and that said requirement is constitutional.

      1.    Does State Law (Gov. Code, § 66780.5, subd. (c)), Require Wheatland's Concurrence to Amend the Bi-County Waste Management Plan?

      Section 66780.5 contemplates triennial review and revision of a county's solid waste management plan. Subdivision (c) provides that

> "... any amendment to the plan shall be approved by a majority of the cities within the county which contain a majority of the population of the incorporated area of the county." (§ 66780.5, subd. (c).)[3]A similarly formulated requirement is also necessary for a county to approve an initial solid waste management plan or for it to transfer its responsibility to adopt one to the regional planning agency for the region. (§ 66780.1.) The subdivision thus requires approval by a "qualified" majority of a county's cities for an amendment to a county solid waste management plan to be adopted. One first determines whether it has been approved by a sufficient number of cities to constitute a majority of the cities in a county -- i.e., a number of cities greater than half of the total number of cities in the county (Webster's *Third New Internat. Dict.* (1971 ed. at p. 1363; cf. 23 Ops.Cal.Atty.Gen. 99, 101 (1954)) -- and then one sees whether their population *also* constitutes more than half of the population of the county's incorporated area.

      There are two incorporated areas in Yuba County: the City of Marysville and the City of Wheatland. Marysville has a population of 10,600 and that of Wheatland is 1,670. (Dept. of Finance, Population Research Unit, "Population Estimates of

---

  [3] Subdivision (c) of section 66780.5 provides in full:

    "(c) *Any amendment to the plan shall be approved by a majority of the cities within the county which contain a majority of the population of the incorporated area of the county.* Each proposed amendment shall be submitted to each city within the county. Each city shall act upon the proposed amendment within 90 days after the city has received the amendment. If a city fails to act upon the proposed amendment within 90 days after receiving the amendment, the city shall be deemed to have approved the amendment as submit- ted. Each amendment shall be submitted to the board for approval as to its compliance with state policy." (Emphasis added.)

  A similarly formulated requirement is also necessary for a county to approve an initial solid waste management plan or for it to transfer its responsibility to adopt one to the regional planning agency for the region. (§ 66780.1.)

California Cities and Counties," Rep. No. 85 E-1 (May 1, 1985.)[4] Inasmuch as there are two cities involved, a majority of their number -- again, a number greater than half -- is two, and thus the concurrence of both of them is necessary to meet the first majority, that "of cities," required by subdivision (c). It would thus be necessary to have the concurrence of the City of Wheatland under section 66780.5, subdivision (c), to amend a Solid Waste Management Plan adopted by Yuba County.[5]

But we do not deal with amending a plan adopted by Yuba County itself but rather with amending one administered under a bi-county arrangement pursuant to the Joint Exercise of Powers Act. Would the subdivision's requirement apply to that being amended as well? We believe so.

For a power under the Joint Exercise of Powers Act (Gov. Code, § 6500 et seq.) to be exercised, it must have been able to have been exercised by each of the contracting parties to the arrangement (6502).[6] In other words, "a public agency may

---

[4] The populations of the six subject jurisdictions as of January 1, 1985, were:

| Sutter County | = 57,600 | Yuba County | = 53,300 |
|---|---|---|---|
| Yuba City | = 21,100 | Marysville | = 10,600 |
| Live Oak | = 3,700 | Wheatland | = 1,670 |
| Total Incorporated | = 24,800 | Total Incorporated | = 12,270 |

(Dept.of Finance, Rep.No.85 E-1, *supra*.)

[5] We reject the suggestion that has been made that subdivision (c) should more properly be read to require a majority of -- "the cities in a county which contain a majority of the population of the incorporated area," i.e., a majority of just those cities in a county that happen to have a majority of the incorporated area's population. If subdivision (c) were read with that perspective, the concurrence of the City of Wheatland would *not* be necessary to amend a solid waste management plan adopted by Yuba County since the required majority of "cities having a majority of the incorporated population," would be satisfied by Marysville alone (see fn.4, *ante*) and its approval would suffice. While grammar favors this construction, we do not believe it comports with the Legislature's intentions regarding the mechanism of subdivision (c) and certainly not the concern it has expressed there and elsewhere in the Act for incorporated areas as such. (See, e.g., §§ 66780, 66780.1, 66780.2, 66784.2.) It is as individual units that the Legislature wished cities to have a voice in rejecting a plan amendment under subdivision (c)'s "majority of cities." The posited interpretation of the subdivision would swallow that voice in the sea of population as the instant example shows.

[6] Section 6502 provides in part:

"If authorized by their legislative or other governing bodies, two or more public agencies by agreement may jointly exercise any power common to the contracting parties, even though one or more of the contracting agencies may be located outside this state. [] It shall not be necessary that any power common to the contracting

5

only enter into a joint powers agreement to do jointly that which the agency is already authorized to do independently. A public agency may not acquire new functions or powers through a joint powers agreement." (60 Ops.Cal.Atty.Gen.148, 151 (1977).) And, "any reasonable doubt respecting the nature or exercise of a power must be resolved against the [agency]." (42 Ops.Cal.Atty.Gen.125, 126 (1963).)

Again, if only Yuba County were involved and we were dealing with the question of amending *its* Plan, section 66780.5, subdivision (c) would apply and require the approval of the City of Wheatland before that could happen. The county would not be able to exercise its power to amend its Plan without that concurrence. The county then takes that power with the same limitation impressed thereon to the Joint Powers Agreement, and the Authority which it joins becomes similarly circumscribed. We therefore conclude that Wheatland's approval is necessary to amend the Yuba-Sutter Bi-County Plan.[7]

2.      Does the Joint Powers Agreement Establishing the Bi-County Waste Management Authority Require the Concurrence of the City of Wheatland to Amend the Bi-County Plan to Build the Ostrom Road Site?

We are called upon to interpret the Joint Exercise of Powers Agreement entered into in 1979 between the six jurisdictions which constitute the Authority to determine whether it gives the City of Wheatland a veto over amending the Bi-County Waste Management Plan to accommodate the proposed sanitary landfill site on Ostrom Road. We conclude that it does.

---

parties be exercisable by each such contracting party with respect to the geographical area in which such power is to be jointly exercised."

[7] We reject the suggestion that since section 66780.5 only applies to individual counties, in the case of the unique Bi-County Plan by extrapolation it would call for a majority of three of the four cities in both counties having a majority of the incorporated populace. When the Legislature has wished that such a majority be necessary to amend a plan of a multi-county area, it has specifically made provision for it. (See 66780.6: the Regional Solid Waste Management Plan for the San Francisco Bay Area must be approved and amended in the general assembly of the Association of Bay Area Governments "by a majority of the counties representing a majority of the population of the San Francisco Bay Area, and ... a majority of the cities representing a majority of the population of [its] incorporated areas ....") If the Legislature wanted that formula to apply to amending the plan of another multi-county area, indeed, if it had even contemplated one, it would have made similar provision. (Cf. *Safer* v. *Superior Court* (1975) 15 Cal.3d 230, 236, 238; *Kaiser Steel Corp.* v. *County of Solano* (1979) 90 Cal.App.3d 662, 667; *Marsh* v. *Edwards Theaters Circuit, Inc.* (1976) 64 Cal.App.3d 881, 891.)

6

In answer to the first question we concluded that state law gives such a veto to the City of Wheatland and that that could not be taken away in a joint powers agreement. Fortunately, the provisions of the subject Agreement are consistent with that demand.

A joint powers agreement, though a creature of statutory origin, is essentially a contractual arrangement between public entities. (Cf. *Housing Authority* v. *City of L.A.* (1952) 38 Cal.2d 853, 868.) In that respect it is no different from a contract between private parties. The Joint Powers Agreement here, no doubt, was only executed after protracted negotiations between the two counties and four cities involved. In the final document to which they all adhered, each reserved to itself certain fundamental powers as part of the "deal" that was struck in the restructuring of their responsibilities. In paragraph 8, each member expressly reserved the right to prevent the Authority from compelling financial contributions from its membership. And, in paragraph 9, each reserved the right to prevent enactment of an amendment to the original Plan:

"All recommendations developed in the originally adopted 1975 Bi-County Solid Waste Plan *and any additional recommendations which may be amended to the original plan after unanimous adoption by member jurisdictions* shall be implemented and administered by the Bi-County Solid Waste Authority except for ... [the adoption of ordinances governing solid waste collection and the adoption of contracts, rate structures and franchises with collection agencies]." ("Agreement," *supra*, 9.)

Thus, although in paragraph 5 of the Agreement a quorum is established as being four of the six-member jurisdictions and in paragraph 6 "four affirmative votes are required for adoption or passage of *any* measure," where "additional recommendations which may be amended to the original plan" are concerned paragraph 9 unequivocally calls for unanimous consent and thus accords the City of Wheatland a veto over them. Again, that was part of the "deal" that was struck when the agency was formed and "absent th[at] voting qualification ..., it is doubtful that the [Agency] could have been formed or Functioned." (*Schindler* v. *Palo Verde Irrigation Dist.* (1969) 1 Cal.App.3d 831, 839.)

> 3. Is it Constitutional for Wheatland to Have A Veto Over Amendments to the Bi-County Waste Management Plan?

In the event that we concluded that the City of Wheatland, with barely two percent of the population of the bi-county area (see fn. 4, *ante*), would have a veto over amendments to the Bi-County Plan, we were asked whether that would be constitutional. It is suggested that such might violate the precept of "one man, one vote" founded in the

Equal Protection Clause of the Fourteenth Amendment and the correlative provisions of the California Constitution (Cal. Const., art. I, § 7). We conclude that it does not.

In *Gray* v. *Sanders* (1963) 372 U.S. 368, the High Court held that Georgia's county-unit system for primary elections was unconstitutional because it gave control of the electoral process to rural minorities and thus a rural voter had more influence than an urban one. (*Id.* at p. 371.) Said the court:

"How ... can one person be given twice or ten times the voting power of another person in a statewide election merely because he lives in a rural area or because he lives in the smallest rural county? Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote--whatever their race, whatever their sex, whatever their occupation, whatever their income and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment. [*Id.* at p. 379.]

". . . . . . . . . . . . . . . . . . . . . . .

"The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing -- one *person*, one vote." (*Id.* at p. 381; cf. *Wesberry* v. *Sanders* (1964) 376 U.S. 1 [U.S. congressman; U.S. Const., art. I,§ 2]; see also *Baker* v. *Carr* (1962) 369 U.S. 186 [federal courts may inquire into such matters].)

The next year, in *Reynolds* v. *Sims* (1964) 377 U.S. 533 and 14 companion cases, the court applied the same precept to the apportionment of both houses of a state's legislature. (*Id.* at p. 568.) It rejected any sophisticated justifications for apportionment otherwise: "Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests." (*Id.* at p. 562.) Four years later, in *Avery* v.*Midland County* (1968) 390 U.S. 474, the requirement was extended to the election of governing bodies of units of local government:

"The Equal Protection Clause reaches the exercise of state power however manifested, whether exercised directly or through subdivisions of the State. [*Id.* at p. 479.]

". . . . . . . . . . . . . . . . . . . . . . .

8

"The constitution imposes one ground rule for the development of arrangements of local government: a requirement that units with general governmental powers over an entire geographic area not be apportioned among single-member districts of substantially unequal population." (*Id.* at pp. 485-486; see also *Hadley* v. *Junior College Dist.* (1970) 397 U.S. 50, 56; cf. *Wiltsie* v. *Board of Supervisors* (1966) 65 Cal.3d 314, 315; *Miller* v. *Board of Supervisors* (1965) 63 Cal.2d 343, 348.)

These and other cases applying the "one *man*, one vote" principle, however, involved *elections*. Where an election is not involved, as one is not here, the High Court has said that "the principle of 'one man, one vote' has no relevancy." (*Sailors* v. *Board of Education* (1966) 387 U.S. 105, 111; cf. *Schindler* v. *Palo Verde Irrigation Dist.*, *supra*, 1 Cal.3d at pp. 836, 837.)[8] Since we do not deal with an election and the question of a "diluted franchise," that should conclude the matter. Perhaps though an additional observation is in order.

The High Court has expressed an awareness of the immense pressures facing units of local government, of the greatly varying problems with which they must deal (*Avery* v. *Midland County, supra,* 390 U.S. at p. 485), and of the fact they "may need many innovations, numerous combinations of old and new devices, [and] great flexibility in ... arrangements to meet changing ... conditions." (*Sailors* v. *Board of Education*, *supra*, 389 U.S. at pp. 110-111.) It has been willing to accord it. For example, even where elections *are* involved in local agencies or districts of limited purpose and powers (as opposed to those possessing general governmental powers or powers of comparable significance), the court has held that "the popular election requirements enunciated by *Reynolds*, *supra*, and succeeding cases are inapplicable." (*Sayler Land Co.* v. *Tulare Water District* (1973) 410 U.S. 719, 730; accord, *Sailors* v. *Board of Education*, *supra*, at p. 111; *Simi Valley Recreation & Park Dist.* v. *Local Agency Formation Com.* (1975) 51 Cal.App.3d 648, 675-681; *Philippart* v. *Hotchkiss Tract Reclamation Dist.* (1976) 54 Cal.App.3d 797, 800-801, 806808; *Schindler* v. *Palo Verde Irrigation Dist.*, *supra*, 1 Cal.App.3d 831, *passim*; but see *Choudry* v. *Free* (1976) 17 Cal.3d 660, 666- 669;

---

[8] The doctrine of "one person, one vote" has been raised, with mixed results, in situations other than just elections for an office, but those situations also perforce involved voting. (See, e.g., *Lockport* v. *Citizens For Community Action* (1977) 430 U.S.259 [separate majorities of city and noncity residents needed in referendum to approve a new county charter]; *Cipriano* v. *City of Houma* (1969) 395 U.S.701 [vote on issuance of revenue bonds]; *Phoenix* v. *Kolodziejski* (1970) 399 U.S.204 [vote on municipal general obligation bonds]; *Fullerton Joint High School Dist.* v. *State Bd.of Education* (1982) 32 Cal.3d 779 [election on proposed new unified school district].)

9

*Fullerton Joint Union High School Dist.* v. *State Bd.of Education*, *supra*, 32 Cal.3d at p. 804.)[9]

      The Court has also held that where identifiable electoral interests can be determined, giving each of them a separate say or veto on an issue affecting each distinctly, does not violate the Equal Protection Clause. (*Lockport* v. *Citizens For Community Action*, *supra*, 430 U.S. at pp. 272-273 [referendum to adopt new county charter; concurrent separate majorities of voting city dwellers and voting non- city dwellers required for approval]):

> "The ultimate question then is whether, given the differing interests of city and noncity voters in the adoption of a new county charter in New York, those differences are sufficient under the Equal Protection Clause to

---

[9] The court's description of the Tulare Water District in *Sayler Land Co.* can equally apply, with purpose changed, to the Bi-County Waste Management Authority here:

> "The appellee district in this case, although vested with some typical governmental powers, has relatively limited authority. Its primary purpose, indeed the reason for its existence, is to provide for the acquisition, storage, and distribution of water for farming in the Tulare Lake Basin. It provides no other general public services such as schools, housing, transportation, utilities, roads, or anything else of the type ordinarily financed by a municipal body. [Record citation.] There are no towns, shops, hospitals, or other facilities designed to improve the quality of life within the district boundaries, and it does not have a fire department, police, buses, or trains. *Ibid.* [] [T]he district [does] not exercise what might be thought of as 'normal governmental' authority, ...." (*Sayler Land Co.* v. *Tulare Water District*, *supra*, 410 U.S.at pp.728-729.)

(See also the description of the Simi Valley Recreational & Park District in *Simi Valley*, *supra*, 51 Cal.App.3d at p. 679.) The result with respect to school districts, however, has usually been otherwise because education has traditionally been a vital governmental function and a district's actions have a broad impact on the life of a community. (*Hadley* v. *Junior College District* (1970) 397 U.S.50 [election of trustees]; *Kramer* v. *Union School District* (1969) 395 U.S.621 [school board elections]; *Fullerton Joint Union High School Dist.* v. *State Bd.of Education*, *supra*, 32 Cal.3d 779 [election for formation of new school district].) So too with a large irrigation district which exercised broad powers and provided services essential to a large number of persons (*Choudry* v. *Free* (1976) 17 Cal.3d 660) and with a municipal improvement district which exercised powers normally held by a municipal government (*Burrey* v. *Embarcadero Mun.Improvement Dist.* (1971) 5 Cal.3d 671). Since no election is involved herein and the right of equal franchise is not questioned, we need not become involved in deciding whether the Agency would be considered the type of special purpose district to which *Reynolds* would not apply. (Compare *Choudry* v. *Free*, *supra*, at pp. 667-668, fn.7, and *Schindler* v. *Palo Verde Irrigation Dist.*, *supra*, 1 Cal.App.3d at p.837, with *Fullerton Joint Union High School Dist.* v.*State Bd.of Education*, *supra*, at p. 804.)

10

justify the classifications made by New York law. [Citations.] If that question were posed in the context of annexation proceedings, the fact that the residents of the annexing city and the residents of the area to be annexed formed sufficiently different constituencies with sufficiently different interests could be readily perceived. The fact of impending union alone would not so merge them into one community of interest as constitution- ally to require that their votes be aggregated in any referendum to approve annexation. Cf. *Hunter* v. *Pittsburgh*, 207 U.S. 161. Similarly a proposal that several school districts join to form a consolidated unit could surely be subject to voter approval in each constituent school district.

"Yet in terms of recognizing constituencies with separate and potentially opposing interests, the structural decision to annex or consolidate is similar in impact to the decision to restructure county government in New York. In each case, separate voter approval requirements are based on the perception that the real and long-term impact of a restructuring of local government is felt quite differently by the different county constituent units that in a sense compete to provide similar governmental services. Voters in these constituent units are directly and differentially affected by the restructuring of county government, which may make the provider of public services more remote and less subject to the voters' individual influence." (430 U.S. at pp. 271-272.)

This language was quoted by the California Supreme Court in *Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra,* which took it as "[making] clear that the state can recognize that residents of different areas may have different interests and, in a single-issue referendum, can constitutionally require concurrent majorities." (32 Cal.3d at p. 801.)

In *Lockport,* the interests of the affected jurisdictions were perceived to be different because there was to be a transfer of governmental functions, duties, and responsibilities in a restructuring of local government. While one jurisdiction might not be *excluded* from having a voice in the restructuring which will affect it (*Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra,* 32 Cal.3d at pp. 801, 802; *Hawn* v. *County of Ventura* (1977) 73 Cal.App.3d 1009, 1021), a requirement can exist that its separate concurrence be secured for it. That really is no different from the situation herein presented of a Joint Powers Agreement entered into between two counties and four cities which necessarily involved the transfer of governmental powers each had exercised before. (§ 6502.) There was no constitutional infirmity in its

requiring separate concurrences, (i.e., unanimity) of the six jurisdictions to adopt their Plan, or to subsequently amend it.

Facially, section 66780.5 itself does not require such unanimity. It only requires a particular majority of affected cities. In this particular situation, however, it does have the effect of requiring their unanimous consent to amend the agreed upon Bi-county Solid Waste Management Plan. We conclude that that too is not unconstitutional.

*****

12