**Jack W. DALY, et al., Plaintiffs,**

v.

**James B. HUNT, et al., Defendants.**

No. 3:93CV371.

United States District Court,
W.D. North Carolina,
Charlotte Division.

March 30, 1995.

Cobb, Ruff, Bond, Cobb, Wade & McNair, Charlotte, NC, for defendants.

## *ORDER*

MULLEN, District Judge.

**THIS MATTER** comes before the Court upon Defendants' Motion for Summary Judgment and Motion to Dismiss, filed February 17, 1994; Plaintiffs' Motion for Summary Judgment, filed February 18, 1994; and Defendants' Renewed Motion for Summary Judgment and Motion to Dismiss, filed May 12, 1994.

This case involves a Constitutional challenge to the method of dividing Mecklenburg County into districts for the election of County Commissioners and School Board members. More specifically, the plaintiffs claim that dividing the county into districts based on total population unconstitutionally weights the votes of citizens in districts that have fewer persons eligible to vote. The plaintiffs argue that districts should be divided based on voting age population, such that each district has about the same number of persons of voting age. By using voting age population instead of total population as the measuring stick, the plaintiffs argue, each person's vote in a district is weighted equally and thus no one's vote is diluted.

The defendants argue that dividing districts based on total population has been consistently utilized by the Supreme Court, and furthermore, that the Supreme Court has never questioned the validity of the total population standard.

### Background

The parties agree on the facts in this case.

Prior to the publication of the 1990 federal decennial census, the Board of Commissioners for Mecklenburg County consisted of seven seats. The occupants of four of these seats were selected from single-member districts, and the occupants of the other three seats were elected at-large. At this time, the Mecklenburg County Board of Education consisted of nine seats. The occupants of these seats were all elected at-large.

The 1990 federal decennial census data disclosed that the population had shifted in Mecklenburg County such that the districts

Nathanael K. Pendley, Winston–Salem, NC, for plaintiffs.

Charles M. Hensey, Thomas F. Moffit N.C. Dept. of Justice, Raleigh, NC, James O.

for the four commissioner seats needed to be redrawn. About this same time, interest surfaced in enlarging the total number of seats on the Board of Commissioners from seven to nine.

In response to the sentiment for new districts and increased seats, the Board of Commissioners appointed a committee of non-board members to consider the options available, draw up alternative plans, and make a recommendation to the Board. This committee became known as "The Blue Ribbon County Governance Committee ("The Blue Ribbon Committee")." The Blue Ribbon Committee recommended a plan in which the number of seats on the Board of Commissioners would be increased to nine. The occupants of six of the seats would be elected from single-member districts, and the three other occupants would be elected at-large. Basically, the plan increased both the number of seats and the number of districts by two.

This recommended plan was approved by the Board of Commissioners and placed on the ballot for consideration by the voters in the 1992 general election. At this election on November 3, 1992, the recommended plan was approved by the voters to become effective for the 1994 election cycle.

After approval of the recommended plan but before its implementation, there was considerable public interest in altering the method of electing the members of the Board of Education for Mecklenburg County from an at-large system to a district system. To accomplish this change, Senators Jim Richardson and Leslie Winner sponsored and introduced a bill during the 1993 long session of the General Assembly of North Carolina. The bill, Senate Bill 613, required six members of the Board of Education to be elected from single member districts and three members to be elected at-large.

As Senate Bill 613 made its way through the legislative process, it was amended to require that members of the Board of Commissioners and members of the Board of Education be elected from the same districts, subject to approval by the voters. The bill was ratified by the General Assembly and thereafter approved by the voters of Mecklenburg County on November 2, 1993.

In this case, the parties initially disagreed on the relevant population figures in each district. However, on May 10, 1994, the parties filed a joint affidavit in which they agreed on the population figures in each district for both the Blue Ribbon Plan and Senate Bill 613 Plan. The population figures are given for total population and voting age population (see Joint Affidavit, filed May 10, 1994).

Under the Blue Ribbon Plan, the total deviation between districts is 1.55% based on total population and 13.45% based on voting age population. Under the Senate Bill 613 Plan, the total deviation between districts is 8.33% based on total population and 16.17% based on voting age population.

## Conclusions of Law

■ The question before this Court is whether the Senate Bill 613 Plan violates the one person one vote principle. In deciding this question, the Court must compare the interest in having representatives share the same number of constituents, representational equality, against the right to have one's vote counted as fully as the vote of any other citizen, electoral equality. Both are important interests and either could be asserted as a basic principle of our form of government. Ordinarily there seem to be few instances where these two interests clash. However, this case is one such instance, and the courts will have to determine how to proceed in spite of somewhat limited guidance in the precedents.

■ The Supreme Court has not directly addressed the question of which interest, representational equality or electoral equality, shall prevail when the two conflict. The only other court to directly deal with the issue is the United States Court of Appeals for the Ninth Circuit in *Garza v. County of Los Angeles,* 918 F.2d 763 (1990). In *Garza,* Hispanics in Los Angeles filed a voting rights action seeking a redrawing of the five districts for the Los Angeles County Board of Supervisors on the grounds that the existing boundaries were gerrymandered in order to dilute Hispanic voting strength. *Id.* The

district court found that the county had intentionally drawn district lines to dilute the voting power of Hispanics in violation of section 2 of the Voting Rights Act and the Equal Protection Clause. *Id.* The district court then accepted and imposed a new districting plan under which one of the districts contained a majority of Hispanics. *Id.* The new districts were apportioned based on total population and contained about the same number of persons. *Id.*

The county appealed to the Ninth Circuit on both the issues of liability and remedy. *Id.* The three judges on the panel all agreed on the issue of liability and affirmed the district court. *Id.* A divided panel affirmed the district court on the issue of remedy; Judge Kozinski dissented. *Id.*

Los Angeles County had argued that the redistricting plan imposed by the district court, based on total population, was unconstitutional because it created two districts where the number of voting age citizens is much lower than in the other districts. *Id.* Therefore, the votes of eligible voters in these two districts were weighted more heavily than votes in the other districts. The majority disagreed with the county's argument stating that the decision in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), stands for the principle that people form the basis of representative government, and thus total population is the appropriate standard. *Id.* at 774.

In his dissent, Judge Kozinski acknowledged that there is some support for the majority's position that total population is the proper standard. *Id.* at 781. However, he pointed out that "in most cases the distinction between voting population and total population will make no substantive difference...." Case Comment, *Garza v. County of Los Angeles: The Dilemma over Using Elector Population as Opposed to Total Population in Legislative Apportionment*, 41 Case W.Res. 1013 (1991). "Judge Kozinski attempted to choose between these conflicting principles by going beyond the semantic formulations of the Supreme Court and attempting 'to distill the theory underlying the principle of one person one vote and, on the basis of that theory, select the philosophy in the fourteenth amendment.'" *Id.* He concluded that "'what lies at the core of one person one vote is the principle of electoral equality, not that of equality of representation.'" *Id.* In fact, "he concluded that 'a careful reading of the Court's opinions suggest that equalizing the total population is viewed not as an end in itself, but as a means of achieving electoral equality.'" *Id.*

The Supreme Court having flung the courts into the redistricting thicket, this Court must practice augury to foresee the likely outcome of this particular political struggle. Although there is no clear precedent and language from the Supreme Court supports both sides of the issue, based upon the haruspicy of Supreme Court cases which follows herein, this Court believes that Judge Kozinski has the better argument.

*Reynolds v. Sims* is nearly universally regarded as the Supreme Court's most significant voting rights case. 377 U.S. 533, 84 S.Ct. 1362. Although there are numerous references to "population" being the basis for apportionment and total population was used as the basis for dividing districts, the language in *Reynolds* implies that the overriding concern of the Court was that every person's vote count equally.

Consider, for example, the following passage:

> To the extent that a citizen's right to vote is debased, he is that much less a citizen. The fact that an individual lives here or there is not a legitimate reason for overweighing or diluting the efficacy of his vote ... But the basic principle of representative government remains, and must remain, unchanged—the weight of a citizen's vote cannot be made to depend upon where he lives. Population is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies.

*Id.* at 567, 84 S.Ct. at 1384. In this passage, it seems clear that the only reason population is the relevant criterion is because it yields a result where one vote does not weigh more than another in a different geographic locale.

Another passage from *Reynolds* indicates that the right to vote on an equal basis is a

more compelling interest than the right to equal representation:

It would appear extraordinary to suggest that a State could be constitutionally permitted to enact a law providing that certain of the State's voter's could vote two, five, or 10 times for their legislative representatives, while voters living elsewhere could only vote once. And it is inconceivable that a state law to the effect that, in counting votes for legislators, the votes of citizens in one part of the State would be multiplied by two, five, or 10, while the votes of persons in another area would be counted only at face value, could be constitutionally sustainable.

*Id.* at 562, 84 S.Ct. at 1382.

Elsewhere in *Reynolds* the Court states: "[s]imply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its *weight* is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State." *Id.* at 568, 84 S.Ct. at 1385 (emphasis added). The Court also states that: "the basic principle of representative government remains, and must remain, unchanged—the *weight* of a citizen's vote cannot be made to depend on where he lives." *Id.* at 567, 84 S.Ct. at 1384 (emphasis added). Still again in *Reynolds* the Court states: "[d]iluting the *weight* of votes because of the place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discrimination based upon factors such as race [citation omitted] or economic status [citation omitted]." *Id.* at 566, 84 S.Ct. at 1384 (emphasis added). These statements suggest that the Supreme Court's overriding concern in *Reynolds* is that each person's vote count equally.

Other Supreme Court cases, both before and after *Reynolds,* also suggest that electoral equality is the true underlying principle adopted by the Supreme Court, *see e.g., Board of Estimate v. Morris,* 489 U.S. 688, 701, 109 S.Ct. 1433, 1442, 103 L.Ed.2d 717 (1989) (quoting *Reynolds,* 377 U.S. at 579, 84 S.Ct. at 1390–91) (emphasis added) ("In calculating the deviation among districts, the relevant inquiry is whether 'the vote of any citizen is approximately equal in *weight* to that of any other citizen....' "); *Lockport v. Citizens for Community Action,* 430 U.S. 259, 265, 97 S.Ct. 1047, 1052, 51 L.Ed.2d 313 (1977) (emphasis added) ("[I]n voting for their legislators, all citizens have an equal interest in representative democracy, and ... the concept of equal protection therefore requires that their votes be given equal *weight.*"); *Chapman v. Meier,* 420 U.S. 1, 24, 95 S.Ct. 751, 765, 42 L.Ed.2d 766 (1975) ("All citizens are affected when an apportionment plan provides disproportionate voting strength, and citizens in districts that are underrepresented lose something even if they do not belong to a specific minority group."); *Hadley v. Junior College Dist.,* 397 U.S. 50, 56, 90 S.Ct. 791, 795, 25 L.Ed.2d 45 (1970) ("[W]hen members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials."); *Wesberry v. Sanders,* 376 U.S. 1, 8, 84 S.Ct. 526, 530, 11 L.Ed.2d 481 (1964) ("To say that a vote is worth more in one district than in another would not only run counter to our fundamental ideas of democratic government, it would cast aside the principle of a House of Representatives elected 'by the People,' a principle tenaciously fought for and established at the Constitutional Convention."); *Gray v. Sanders,* 372 U.S. 368, 379, 83 S.Ct. 801, 808, 9 L.Ed.2d 821 (1963) ("Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit."). (This Court is obviously indebted to Judge Kozinski's dissent in the selection of these cases. *Garza* at 780–81.)

The defendants argue that the Supreme Court has never questioned the validity of the total population standard and thus it is unassailable. However, in all but one of the cases cited by the defendants, the issue before the Supreme Court was not one of representational equality versus electoral equality, and therefore, this court believes that in those cases the Supreme Court simply did

not consider the possibility that the two goals of representational equality and electoral equality may diverge.

*Burns v. Richardson* is the only Supreme Court case that presented a divergence between representational equality and electoral equality. 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966). In *Burns,* the Supreme Court "... approved the departure from strict population figures because raw population did not provide an accurate measure of whether the voting strength of each citizen was equal." *Garza* at 784. In his dissent, Judge Kozinski argues, and this Court agrees, that this departure from strict total population figures "can only be explained as an application of the principle of electoral equality." *Id.*

Based on the foregoing, this court concludes "that it is the principle of electoral equality that lies at the heart of one person one vote...." *Id.* at 785. The redistricting plan under Senate Bill 613 must therefore be examined through this particular lens to determine whether the plan passes constitutional muster.

■ The Supreme Court's standard for variances in non-congressional redistricting "permits only the limited population variances which are unavoidable despite a good faith effort to achieve absolute equality, or for which justification is shown." *Kirkpatrick v. Preisler,* 394 U.S. 526, 531, 89 S.Ct. 1225, 1229, 22 L.Ed.2d 519 (1969). Mathematical exactness and precision is not a constitutional requirement, *Reynolds* at 577, 84 S.Ct. at 1389–90; "[d]e minimis variations are unavoidable...." *Swann v. Adams,* 385 U.S. 440, 444, 87 S.Ct. 569, 572, 17 L.Ed.2d 501 (1967). As a general rule, "an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations." *Brown v. Thomson,* 462 U.S. 835, 842, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214 (1983).

Using the ten percent guideline, the districting plan under Senate Bill 613 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Using voting age population, the deviation between districts is 16.17%. This variance is well in excess of 10% and is unacceptably and unconstitutionally large. Furthermore, the defendants have offered no legitimate justifications for the large variances. Therefore the districting plan created by Senate Bill 613 is unconstitutional.

**THEREFORE, IT IS HEREBY ORDERED** that:

1. The plaintiffs' Motion for Summary Judgment is **GRANTED;**

2. The defendants are enjoined from conducting any elections for seats on the Board of County Commissioners or the Board of Education pursuant to the districting plan created by Senate Bill 613;

3. The defendants are directed to prepare a redistricting plan for the Board of County Commissioners and Board of Education based on voting age population and adopt the same as quickly as reasonably possible;

4. Defendants' Motion for Summary Judgment and Dismissal or, in the Alternative, Judgment on the Pleadings, filed February 17, 1994 is **DENIED;** and,

5. Defendants' Renewed Motions for Summary Judgment and Dismissal, filed May 12, 1994, are **DENIED.**